UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| SADIYA ALI, ON BEHALF OF A.I., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LONG CREEK YOUTH DEVELOPMENT | ) | Civil No._____ |
| CENTER; MAINE DEPARTMENT OF | ) | |
| CORRECTIONS; JOSEPH FITZPATRICK, | ) | |
| Commissioner of Maine Department of | ) | |
| Corrections; CAROLINE RAYMOND, | ) | |
| Superintendent of Long Creek Youth | ) | |
| Development Center; MICHAEL A. MULLIN, | ) | |
| Corrections Officer at Long Creek Youth | ) | |
| Development Center; DANIEL A. FERRANTE, | ) | |
| Corrections Officer at Long Creek Youth | ) | |
| Development Center; KIM FOSTER, nurse | ) | |
| practitioner at Long Creek Youth Development | ) | |
| Center; DAVID DROHAN, DDS, dental care | ) | |
| provider at Long Creek Youth Development | ) | |
| Center; CORRECT CARE SOLUTIONS, LLC., | ) | |
| medical care provider at Long Creek Youth | ) | |
| Development Center. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**INJUNCTIVE RELIEF REQUESTED**

Plaintiff Sadiya Ali, on behalf of her son A.I., a minor, complains against Defendants

Maine Department of Corrections ("DOC"), Long Creek Youth Development Center ("Long

Creek"), Dr. Joseph Fitzpatrick, Caroline Raymond, Officer Michael A. Mullin, Officer Daniel

A. Ferrante, Kim Foster, Dr. David Drohan, and Correct Care Solutions, LLC, ("CCS") as

follows:

**INTRODUCTION**

1.      This is a civil rights case challenging the use of excessive force, deliberately

indifferent medical care, and statutory violations against A.I., an 11-year-old boy.

1

2.      In the summer of 2017, A.I. was temporarily detained at Long Creek Youth Development Center ("Long Creek"). During his detention, Long Creek medical providers failed to treat A.I. for his severe Attention Deficit Hyperactivity ("ADHD") disorder, despite knowing that he required medication and treatment. As a result, A.I. experienced ADHD symptoms and occasionally acted out. During one incident, he was confined in his cell alone, posing no danger to himself or others. Despite the absence of any physical threat, Officers Mullin and Ferrante entered A.I.'s cell, forcefully grabbed him, and bashed his face into the bare metal bedframe, breaking and knocking out his teeth. An independent report by the Children's Center for Law and Policy issued in December 2017 ("CCLP Report") found that the force used was "clearly" excessive.

3.      After the officers injured A.I., they were deliberately indifferent in providing medical treatment. Rather than immediately seeking medical care, the officers first tried to put a spit mask on A.I.'s bloody face. A spit mask is a law enforcement tool, not a medical device, and could have caused A.I. to choke on his own blood.

4.      Once A.I. was finally referred to medical providers inside the facility, those providers deliberately withheld emergency dental treatment. In light of the serious trauma to his teeth, A.I. required emergency dental treatment within hours. Despite that dental emergency, medical providers wasted time placing 11-year-old A.I.'s hands and feet in shackles and transporting him to the Emergency Room, where he did not see a dentist. By that time, it was too late to replace his knocked-out tooth. A.I. did not see a dentist for a total of *six days*.

5.      Even when A.I. finally saw a dentist, Dr. David Drohan, DDS, unreasonably deprived A.I. of necessary medical treatment as punishment for A.I.'s perceived noncompliance with instructions to sit still. Because of A.I.'s ADHD and resulting difficulty in sitting still in the dentist chair, Dr. Drohan refused to treat the possible root tip that remained in A.I.'s mouth.

6. Finally, the entities of DOC and Long Creek also violated A.I.'s right to reasonable accommodation of his disability. A.I. suffers from severe ADHD, which was well known by medical personnel and by other Long Creek officials. Yet, when A.I. experienced an outburst because of his disability, Long Creek officials refused to enlist a mental health clinician or use de-escalation methods to accommodate A.I.'s disability. That deprivation arose from Long Creek's policies and training, including a policy of withholding mental health clinicians in similar mental health crises and inadequate de-escalation training. Instead of providing mental health treatment or de-escalation, Long Creek officers bashed A.I.'s head into a metal frame— which was not a reasonable accommodation of his disability.

7. In sum, Defendants have violated the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, the Maine Constitution, and Maine statute. A.I. seeks compensatory and punitive remedies that will compensate him for his suffering and deter future constitutional violations. And, because of the imminent risk of A.I. being forced to return to Long Creek—due to recent new charges filed against him—A.I. also seeks an injunction to enjoin future unconstitutional excessive force, deliberately indifferent medical care, and violations of the Americans with Disabilities Act and the Rehabilitation Act.

## PARTIES

8. Plaintiff Sadiya Ali, the mother of A.I., is a resident of Portland, Maine. She arrived in the United States more than ten years ago as a Somali refugee from Kenya, when A.I. was six months old. Ms. Ali is a lawful permanent resident of the United States.

9. A.I. is a minor child currently living with his mother and attending school in Portland, Maine. A.I. was born in Kenya and is a citizen of Kenya and is a lawful permanent resident in the United States. A.I. has been diagnosed with severe Attention Deficit

3

Hyperactivity Disorder ("ADHD"), a brain disorder characterized by hyperactivity and impulsivity.

10.     Defendant Long Creek Youth Development Center ("Long Creek") is a state-run center for the incarceration of juveniles.  34-A M.R.S. §§ 3801, 3802. It is the sole juvenile detention center in Maine.

11.     Defendant Maine Department of Corrections ("DOC") is the department under which Defendant Long Creek is operated. 34-A M.R.S. § 1202. DOC is "responsible for the direction and general administrative supervision, guidance and planning of adult and juvenile correctional facilities and programs within the State." *Id.*

12.     Defendant Joseph Fitzpatrick, Ph.D., sued in his official capacity, is the DOC Commissioner. In that role, he has "general supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program." 34-A M.R.S. § 1402(1).

13.     Defendant Caroline Raymond, sued in her official capacity, is the current Superintendent at Long Creek. Upon information and belief, one of the Superintendent's duties is to review incident reports, including incidents involving excessive force against juveniles, and to supervise training of correctional officers.

14.     Defendant Officer Michael A. Mullin, sued in his individual capacity, served as a correctional officer at Long Creek during the relevant period from June 24 to August 2, 2017, and was an agent of DOC and Long Creek. At all times relevant to this Complaint, Officer Mullin acted under color of state law.

15.     Defendant Officer Daniel A. Ferrante, sued in his individual capacity, is a corrections officer at Long Creek during the relevant period from June 24 to August 2, 2017, and

was an agent of DOC and Long Creek. At all times relevant to this Complaint, Officer Ferrante acted under color of state law.

16.    Defendant Kim Foster, Nurse Practitioner, sued in her individual capacity, is a nurse practitioner at Long Creek, and an agent of DOC, Long Creek, and Correct Care Solutions ("CCS"). At all times relevant to this Complaint, Nurse Practitioner Foster acted under color of state law.

17.    Defendant David Drohan, DDS, sued in his individual capacity, is an oral surgeon at Long Creek, and an agent of DOC, Long Creek, and CCS. At all times relevant to this Complaint, Dr. Drohan acted under color of state law.

18.    Correct Care Solutions, sued in its individual capacity, is a private contractor that has contracted with DOC to provide medical and dental care to children incarcerated in Long Creek.  Long Creek contracts with CCS to provide a part-time dentist, oral surgeon, and dental assistant. Other health providers provided through CCS include a part time physician, a part time psychiatrist, a part time nurse practitioner, and 4.2 full time registered nurses. At all times relevant to this Complaint, Correct Care Solutions acted under color of state law and as an agent of DOC and Long Creek.

### JURISDICTION

19.    This action seeks to vindicate rights guaranteed by the Fourteenth Amendment to the United States Constitution, and it is brought pursuant to 42 U.S.C. § 1983.

20.    This action is also brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(d).

21.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.  Jurisdiction is also authorized pursuant to 28 U.S.C. §1343(a)(3).

5

22.     Pursuant to 28 U.S.C. § 1367(a), this Court possesses supplemental jurisdiction over state law claims under the Maine Civil Rights Act, 5 M.R.S. §§ 4681-85, and the Maine Tort Claims Act, 14 M.R.S. §§ 8101-8118.

23.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this judicial district and because the Defendants are subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

### I.     Long Creek's Troubled History

24.     Before A.I. arrived at Long Creek, numerous concerns had been raised about Long Creek's treatment of youth with mental health diagnoses.

25.     For example, in January 2017, the Department of Corrections issued a report finding that most children housed at Long Creek suffer from mental health disabilities. The report found that more than 80 percent of youth arrive at Long Creek with three or more mental health diagnoses, and more than 75 percent of youth at Long Creek had received mental health outpatient services. An independent report issued in December 2017 by the Children's Center for Law and Policy ("CCLP Report") stated that Long Creek was "not the right place for many of the youth in its care," who often have mental health diagnoses.

26.     Even earlier, in October 2016, a 16-year-old transgender boy, Charles Knowles, died while detained in Long Creek's. After the tragedy, Knowles's mother explained that her son had a long and well-documented history of mental illness. Yet her repeated requests for Long Creek to provide mental health treatment were rebuffed, she said. Although Long Creek said they would keep her son safe, she said he was not seen regularly by a psychiatrist for most of his time at Long Creek. Charles Knowles ended his life while on suicide watch in October 2016.

## II.    A.I.'s Detention at Long Creek

27.    A.I. was detained in Long Creek when he was 11 years old and in the sixth grade. He was (and remains) diagnosed with mental health illnesses, including severe ADHD. Indeed, when referencing the facts of his case, an independent report by the Children's Center for Law and Policy ("CCLP Report") confirmed that A.I. has "serious mental disorders."

28.    The juvenile court later found that A.I. was not competent to stand trial and will not become competent in the reasonably foreseeable future. Accordingly, the court dismissed all charges against him. A.I. has never been adjudicated of any offense.

29.    On June 24, 2017, A.I. was detained in Long Creek after being charged with two Class D offenses relating to an incident at the local pool, in which A.I. became upset after being told he could not swim in the deep end of the pool.

30.    Two days later, on June 26, 2017, A.I. had a court date to determine whether he would continue to be detained at Long Creek. His mother and several community members requested that he be released to his mother with support from extended family. But, upon the request of the prosecutor, A.I. remained detained at Long Creek, in part to avoid the "risk of harm" to A.I.

31.    In an email dated June 26, 2017, the prosecutor indicated that "all" were hoping that appropriate supports could be put in place so that A.I. could safely return home. The implication was that, until those supports were in place, A.I. would be safer at Long Creek than at home.

32.    A.I. was not safe at Long Creek. This complaint arises from an incident that occurred in Long Creek on or about July 26, 2017, in which two officers knocked out A.I.'s front teeth.

**III.    The Month Leading Up To The July 26, 2017 Incident**

33.    Three themes emerged in the month-long period leading up to the July 26, 2017 incident.

34.    First, Long Creek officials identified A.I.'s serious mental health disabilities, yet did not prescribe his ADHD medication, in violation of written Long Creek policy.

35.    Second, A.I. exhibited clear and escalating symptoms relating to his ADHD, yet Long Creek did not provide his medication or any appropriate therapeutic treatment with a psychiatrist. The inaction continued even though Long Creek officials up and down the chain of command were aware of A.I.'s disability and challenges.

36.    Third, instead of providing medical care, Long Creek officials punished A.I. for symptoms relating to his ADHD. Such punishment included room confinement and other deprivations, making A.I.'s symptoms even worse.

37.    As background, Long Creek has numerous written policies regarding mental health treatment and prescriptions. *See* Policy 13.6 (Mental Health Services); Policy 13.7 (Pharmaceuticals). Upon admission, Long Creek staff must screen youth for mental health illness, Policy 13.6 VI(A)(1), and must "assure continuity of mental health care for residents with identified mental health needs." *Id.* 13.6 IV(E).

38.    Regarding prescriptions, a youth's "current prescription" for psychotropic medication shall generally "be continued" at least until the youth has seen the facility psychiatrist. Policy 13.7(VI)(K)(2). And pharmaceutical medications at Long Creek shall be prescribed when "clinically indicated." Policy 13.7 VI(C).

39.    As further background, the CCLP Report found "[a]n overuse of room confinement" at Long Creek, and that such room confinement could "worsen" the problems of

"[y]outh with mental health problems" and deprive youth of "access to legally required services, such as educational services and recreation."

40.    Long Creek officials were on notice of A.I.'s disability since his first day in detention, and became aware of his existing prescription for ADHD medication not long after. On June 24, 2017, a nurse wrote in A.I.'s file as part of his intake that "mental health [was] contacted," indicating a referral to the mental health care staff. On the same day, A.I. was sent to the medical unit after an altercation with another youth. The nurse observed "[i]neffective impulse control," which is a symptom of ADHD. Yet she did not recommend treatment or other follow-up, instead instructing A.I. to "[t]ell staff if any injuries occur."

41.    Instead of providing A.I. with treatment for his disability, Long Creek officials punished him by withholding "recreation" for three days.

42.    Four days later, on June 28, 2017, a Long Creek employee wrote to the Portland Public Schools, requesting academic programming for A.I. The letter acknowledged that A.I. was "a special education student," reflecting the awareness among Long Creek employees that A.I. had a disability.

43.    The next day, on June 29, 2017, a juvenile program manager wrote an email to numerous Long Creek employees, including the acting Superintendent and both Deputy Superintendents. The email stated that A.I. "is very young but has learned behaviors that are not acceptable in the community." The email did not mention any mental health options for treatment, instead proposing corrections methods and punishments.

44.    On July 3, 2017, A.I. was sent to the medical unit, where the nurse observed that he would "not sit still," a symptom of ADHD. Yet, rather than referring for treatment of ADHD, the nurse sent A.I. "back to the Maple unit, no tx [treatment] was needed."

9

45.     Instead of providing treatment, Long Creek officials imposed a TV restriction for two days, plus a time-out in A.I.'s room. Two days later, on July 5, 2017, Long Creek officials imposed another punishment of another two days without TV and five hours of pod restriction. They still did not refer him to treatment with a mental health provider, or provide him with his ADHD medication.

46.     On July 7, 2017, Long Creek officials isolated A.I. from the rest of the youth by putting him on intensive behavioral management status—which means isolating him from the general population and confining him in "a designated special management housing area or other appropriate setting." Policy 10.3(VI)(A). Although such confinement "may be used only if another reasonable less restrictive alternative would not be effective," *id.*, Long Creek officials did not provide ADHD medication or other mental health treatment, which would have been a less restrictive alternative than room confinement.

47.     On July 10, 2017, Maureen Lonsdale, a licensed social worker (LSW) at Long Creek, notified other medical staff, including Nurse Practitioner Foster, of A.I.'s existing prescriptions for ADHD. Specifically, Ms. Lonsdale notified Nurse Practitioner Foster that A.I. "was prescribed Ritalin 10 mg" by his primary care physician at Maine Medical Center, with 1.5 tabs in the morning and 1.5 tabs at noon. Yet even then, Nurse Practitioner Foster did not provide ADHD medication to A.I., despite having prescribing authority to do so.

48.     Instead, Long Creek officials again placed A.I. on room confinement the next day, again, without providing mental health treatment or medication.

49.     On July 14, 2017, approximately two weeks before the incident, Ms. Lonsdale wrote an email to Long Creek officials and others. A large portion of the email addressed A.I.'s mental disability and his history of medication treatment. Ms. Lonsdale stated that "AI's diagnosis was; (sic) Attention Deficit Hyperactivity Disorder and Oppositional Defiant

10

Disorder." She noted that A.I. had positive outcomes from medication in the past. As stated in the email, "Mom reports he did a lot better on [t]he medications, he was quieter and in better control on the medications, she is in favor of taking them." Despite this additional flag, Long Creek failed to provide A.I. with his ADHD medication.

50.     In the meantime, A.I. experienced worsening symptoms relating to his ADHD. In response, Long Creek officials punished him by imposing a five-hour pod restriction on July 13 and 14, another round of room confinement on July 14, 2017, two days of "no outside" time on July 14 and 15, and a time-out on July 15, 2017. Two days later, on July 17 and 18, Long Creek officials punished A.I. with seven hours of "pod time."

51.     On July 18, 2017, eight days before the incident, Nurse Practitioner Foster stated in medical records that A.I. "certainly would benefit from ADHD medication. He remains impulsive, short fused, and inattentive." Yet she did not prescribe him ADHD medication, nor did she refer him to other ADHD treatment.

52.     Based on her treatment notes, Nurse Practitioner Foster believed that A.I.'s ADHD medication was clinically necessary, but did not prescribe or provide it because of A.I.'s professed unwillingness to take the medication. That was unreasonable and in reckless disregard for A.I.'s serious medical needs—for several reasons.

53.     First, Nurse Practitioner Foster acknowledged the history of the school nurse administering A.I.'s ADHD medication, and had no reason to believe that A.I. would not take the medication if similarly administered at Long Creek.

54.     Second, A.I. had previously signed a form stating that he would take his "medication as prescribed by the physician."

55.     Third, failing to prescribe the medication violated Long Creek's policy of prescribing clinically indicated medication. Potential non-compliance provides no basis for

11

failing to prescribe. It is not uncommon for youth to refuse medication, so Long Creek has numerous written procedures for treatment noncompliance. *See, e.g.*, Policy 13.7(VI)(L). Specifically, a minor who refuses prescribed medication must be counseled, and then assessed for any harmful effects of the medication noncompliance. Policy 13.6(I) Policy 13.7(L). If he continues to refuse prescribed psychotropic medication (such as Ritalin) after assessment, staff shall proceed with further action if necessary. *See* Policy 13.6(I) Policy 13.7(L). None of these policies were followed for A.I. before the July 26, 2017 incident, because Nurse Practitioner Foster did not even prescribe the medication.

56. On July 20, 2017, six days before the incident, A.I. was sent to the medical unit after an altercation. The nurse observed "[i]neffective impulse control," but did not recommend treatment of the ADHD. Instead, she advised that A.I. follow up if there were any physical symptoms, asking him to "[t]ell staff if any pain or injury occurs."

57. Instead of providing A.I. with treatment, Long Creek officials imposed the punishment of "no recreation."

58. Later in the day on July 20, 2017, a judge approved discharging A.I. from Long Creek as soon as home and community-based treatment (HCT) services were in place, making it safe for A.I. to return home. Yet A.I. remained in detention for weeks after that, including on July 26, 2017, when his teeth were knocked out by Long Creek officers.

59. On July 23, 2017, three days before the incident, A.I. was sent to medical after an "altercation in unit." The nurse observed "ineffective impulse control," but did not recommend treatment of the ADHD. Instead, she advised A.I. to follow up if he experienced any physical symptoms, asking him to "[t]ell staff if any pain or injury occurs."

60. Instead of providing A.I. with medical treatment, Long Creek staff punished him with two "time outs."

61.    The next day, July 24, 2017, after a month of detention, Long Creek finally obtained the Academic Programming Agreement from A.I.'s school. The agreement noted that A.I. had an individualized education program (IEP) for students with disabilities. It further noted, under A.I.'s "disability category," that A.I. suffered from "multiple disabilities." Yet A.I. was not referred for treatment to mental health providers, and was not prescribed his ADHD medication.

62.    Instead of providing treatment, Long Creek staff punished A.I. for acting out by requiring four and a half hours in the "pod."

63.    On July 25, 2017, one day before the incident, A.I. went to the medical unit for a sick call based on a complaint relating to his ear. But the nurse refused to see him because he was "unwilling to sit" for an exam. As she described, A.I. "was trying to grab medical gloves and paper towels, [and] wanted to use the otoscope himself." After refusing treatment based on A.I.'s restlessness, the nurse stated that A.I. could "resubmit a sick call if his ear continues to bother him." The nurse did not refer A.I. to mental health providers. Instead, later in the day, Long Creek staff sent A.I. to another time out.

64.    In sum, in the month leading up to the July 26, 2017 incident, A.I. experienced many ADHD symptoms, but was never prescribed his ADHD medication and was instead punished for his symptoms. It was not until *after* the July 26, 2017 incident that Nurse Practitioner Foster finally prescribed A.I. with his normal dose of Ritalin.

**IV.    The July 26, 2017 Incident**

65.    On the morning of July 26, 2017, A.I. was in the cafeteria for breakfast, when a Long Creek staff member told A.I. that he would not be permitted to attend a facility picnic later in the day. A.I. was upset about this, and he expressed his frustration by tossing his tray on the

floor. Tossing the tray on the floor was a symptom of A.I.'s ADHD, which affects impulse control and ability to react appropriately to stimulus.

66.     Rather than referring A.I. to treatment, the security staff in the cafeteria responded to A.I.'s actions by locking up A.I. in his cell alone, and punishing A.I. by restricting his normal privileges of using the gym and other facilities with his peers.

67.     Later that morning, A.I. had to use the bathroom. The room where he was confined did not have a toilet. A.I. attempted to alert the correctional officers to this need by repeatedly ringing a buzzer in his room.  There was no response. As the Supreme Court has recognized, "a deprivation of bathroom breaks" can create "a risk of particular discomfort and humiliation" with potential constitutional implications. *Hope v. Pelzer,* 536 U.S. 730, 738 (2002).

68.     A.I. continued to request access to the bathroom, banging on the door of his cell. Supervisor Kevin Drain overheard the noise and approached A.I.'s door, where he was joined by Manager Beth Peavey and Officer Brown. They would not allow A.I. to use the bathroom. A.I. told the gathered officers that he would try to throw something to trigger the sprinkler if they did not let him use the bathroom. In response, Supervisor Drain and Manager Peavey told him to "leave the sprinkler alone or everything in [the] room would be removed."

69.     Even though A.I. did not activate the sprinklers, Supervisor Drain requested additional staff to remove items in his room. Officers Mullin and Ferrante responded to his request, and arrived outside of A.I.'s door. At this time, A.I. was confined alone in his room. His behavior did not pose a physical threat to the officers, to himself, or to any other person.

70.     Despite the absence of any physical threat, Officers Ferrante and Mullin entered A.I.'s room and removed his pillow and mattress, leaving the bare metal bed frame exposed.

71.     A.I. then stated that he would use his shoes to trigger the sprinkler. Upon Supervisor Drain's instruction, Officers Ferrante and Mullin forcibly removed A.I.'s shoes. Next, the officers started removing the items under A.I.'s bed. As the officers left the room, Supervisor Drain saw A.I. spit past (not on) the officers.

72.     These behaviors exhibited by A.I., including his outburst and spitting, were related to the lack of impulse control that accompanies ADHD and exacerbated by the officers' actions and failure to provide reasonable accommodation. As found by the CCLP Report, "[t]here is no question" that A.I.'s "disruptive behavior was closely related to [his] mental health problems." The best way to immediately address an outburst like A.I.'s in a child with ADHD is to use the skills of a mental health professional or clinician. At the very least, de-escalation methods should have been used to defuse the situation.

73.     Without contacting a mental health professional and without using de-escalation procedures, Officer Mullin and Ferrante re-entered A.I.'s room and approached A.I. They forcefully restrained A.I. from behind.

74.     At the time, A.I. was an 11-year old child who weighed less than 120 pounds and was five foot three inches tall.  While being restrained from behind by two adult male corrections officers, he was unable to harm himself or others.

75.     Despite the absence of any physical danger to themselves or others while A.I. was being restrained, Officer Mullin and Officer Ferrante proceeded to bash A.I.'s face into the metal bed frame.

76.     Blood spurted everywhere.  A.I. was in severe pain. He began to cry and said he was sorry. The attack on A.I. was forceful enough to knock out one of his front teeth and break the other tooth at the gum line. When A.I. stood up, he was bleeding profusely.  A.I. felt his mouth and discovered that his two front teeth were gone.

77.    The assault on A.I. was captured by at least one video camera.  The video recording is currently in DOC custody.

78.    After the attack, Manager Peavey, Officer Ferrante, Officer Mullin continued to restrain A.I., and attempted to put a spit mask on his bloody face.  A spit mask is a law enforcement tool, not a medical device. There was no medical benefit to the spit mask, and putting a spit mask on someone who is bleeding could cause that person to choke on his own blood. The officers did not seek medical help until Officer Mullin mentioned that A.I. was bleeding.

79.    The use of force by Officer Mullin and Officer Ferrante was reckless and unreasonable in light of numerous factors, including, but not limited to: (1) A.I.'s young age and small weight, (2) the behavior exhibited by A.I. and its relation to his mental health disability, (3) the fact that A.I. was not posing a physical danger to any other person, (4) the extreme disproportionality of the degree of force used.

80.    Officer Ferrante's and Officer Mullin's use of force also conflicted with their training on restraint techniques. As detailed in the CCLP Report, correctional officers had been trained not to restrain youth face down on their stomachs. Yet Officer Ferrante and Officer Mullin restrained A.I. by forcing him down on his stomach and bashing his head into the bed.

81.    Upon information and belief, Officer Ferrante and Officer Mullin knew that bashing A.I.'s head against his bed hard enough to break his front teeth was not a reasonable measure to minimize harm. The amount of force they used was clearly excessive. Indeed, the CCLP Report described the July 26, 2017 incident involving A.I., and stated that staff clearly used excessive force.

16

82.    After the incident, Long Creek staff failed to notify Ms. Ali about her son's injury. Ms. Ali does not speak English, yet Long Creek staff never used a translator to communicate with her about her son's injury.

83.    Ms. Ali visited A.I. a couple of days after the incident, and nearly collapsed when she saw that her son's front teeth had been knocked out. When Ms. Ali asked what happened to her son, a member of Long Creek staff told her—falsely—that A.I. had tripped and fallen on his bed.

## V.    Inadequate Medical Care

84.    After the officers injured A.I., the medical providers at Long Creek were deliberately indifferent in providing him medical care. As a result, A.I. lost his brief opportunity to replace one of his lost teeth and was sent home with broken tooth fragments in his mouth.

85.    Specifically, after the incident, Manager Peavey contacted the medical unit at approximately 9:10 AM. Nurse Jessica Brown, arrived at A.I.'s unit within 5 minutes. She found A.I. "sitting on his bed" and "spitting saliva and blood onto what appeared to be bedding material." A.I. showed the nurse his mouth, with his two front teeth "missing." As stated in his records, "staff had 1 [one] tooth in a glove and stated they thought the resident swallowed the other one."

86.    Because one of A.I.'s teeth was found, there was a brief window in which the tooth should have been reinserted in the empty socket. A reinserted tooth can reattach in the mouth, with later stabilization from a dentist's splint, thus saving the tooth.

87.    Yet the medical care providers—including CCS, Nurse Practitioner Foster, and Dr. David Drohan—recklessly disregarded the serious medical condition of an avulsed tooth. None of them attempted (or advised) to reinsert A.I.'s tooth into his mouth. Nor did they attempt

17

to have A.I. seen by a dentist within the half-hour-to-one-hour period typically necessary to succeed in reattaching an avulsed tooth. In fact, A.I. did not see a dentist for *six days*.

88.    Instead, based on Long Creek and CCS policies and Dr. Drohan's instructions, Long Creek medical providers spent approximately two hours placing 11-year-old A.I.'s hands and feet in shackles to transport him to the Maine Medical Center Emergency Room, where he did not see a dentist. As a result of the delay, A.I. lost the opportunity to save his front tooth.

89.    While A.I. was at the Emergency Room, the on-call physician learned that Long Creek kept an oral surgeon on staff, and sent A.I. back to Long Creek to follow up with the oral surgeon.

90.    Upon A.I.'s return to Long Creek, CCS and Dr. David Drohan failed to follow-through on Maine Medical Center's referral to an oral surgeon.

91.    Long Creek and CCS did not even schedule A.I. with a dental appointment until six days after his injury.

92.    When A.I. finally had a dental appointment six days later, Dr. Drohan, DDS, refused to treat the tooth fragments in A.I.'s mouth because A.I. would not sit still. Upon information and belief, CCS has a policy of withholding medical care for youth that it deems noncompliant, without contacting a parent or guardian.

93.    Specifically, in an exam on August 1, 2017, Dr. Drohan stated that A.I. was using profanities and "has no ability to sit still for more than a few seconds." Dr. Drohan's examination showed "possible root tip," yet he stated that "further examination of possible root tip" was not medically necessary and declined to take further action during incarceration. Dr. Drohan stated that he withheld treatment "*given pt [patient] inability to cooperate in any manner*." (emphasis added).

18

94.     By withholding treatment for "possible root tip, treatment [of the possible root tip] and replacement" of A.I.'s teeth, Dr. Drohan acted in reckless disregard of A.I.'s serious medical needs. A.I. remained in Long Creek without receiving necessary medical and dental care until he was released on August 2, 2017.

## VI.     System-wide Discrimination Against Individuals With Disabilities

95.     Juvenile detention facilities such as Long Creek are prohibited under the Americans with Disabilities Act and section 504 of the Rehabilitation Act from discriminating against youth because of their disabilities. In violation of those statutes, Long Creek officials refused to enlist mental health clinicians or use de-escalation techniques when A.I. was experiencing symptoms relating to his ADHD on July 26, 2017; instead, they brutally beat A.I. By doing so, Long Creek and DOC discriminated against A.I. by deliberately refusing reasonable accommodations for his mental health disabilities.

96.     A.I. is a qualified individual with mental health disabilities, including severe ADHD. A.I.'s disabilities substantially limit his major life activities of learning, concentrating, thinking, communicating, and interacting with others. Despite these disabilities, A.I. remains qualified—just like any other inmate—to receive appropriate services during detention at Long Creek.

97.     Staff at Long Creek knew that A.I. had mental health illnesses, including ADHD. As detailed above, at ¶¶ 33-64, Long Creek staff knew that A.I. was diagnosed with severe ADHD, that he was prescribed ADHD medication, and that he was provided with an Individualized Education Program (IEP) because of his multiple disabilities. They also knew that, because of his disability, A.I. suffered from lack of impulse control and other symptoms that could result in him acting out.

19

98.     A.I.'s actions on July 26 were manifestations of his ADHD. Indeed, the CCLP Report reviewed that incident, and stated that there was no question that the disruptive behavior at issue was closely related to mental health problems. Reasonable accommodation for A.I.'s disability would have included enlisting the aid of a mental health clinician trained in treating such mental health outbursts or, at the very least, using de-escalation methods to resolve the situation. Supervisor Drain, Manager Peavey, Officer Mullin, and Officer Ferrante—all of whom were present at the July 26, 2017 incident—did none of these things.

99.     Supervisor Drain, Manager Peavey, Officer Mullin, or Officer Ferrante never contacted a mental health clinician to assist A.I. That deprivation was approved by Long Creek policy, which prohibits staff from contacting mental health clinicians to intervene directly in mental health crises, even when (as in A.I.'s case), the confrontation results from the youth's mental health illness.

100.    Under Long Creek's policy, mental health clinicians get involved by reviewing the incident only *after* the mental health crisis, based on the misguided rationale that engaging clinicians directly during a crisis would positively reinforce youth who are acting out.

101.    As indicated in the CCLP Report, Long Creek's policy regarding mental health clinicians mixes up priorities in the facility. The purpose of having clinicians in the facility is to provide mental health services to youth who need them, yet the policy withholds clinicians exactly when they are needed most. By withholding mental health clinicians during A.I.'s outburst, Long Creek deliberately and recklessly withheld reasonable accommodation for A.I.'s disability.

102.    At the very least, a reasonable accommodation would have required the officers to use de-escalation techniques. Yet Supervisor Drain, Manager Peavey, Officer Mullin, and Officer Ferrante failed to use de-escalation techniques, and instead escalated the situation by

20

entering the room and removing everything—from the mattress and pillows, to the shoes on A.I.'s feet.

103.   Inadequate de-escalation training is a system-wide problem at Long Creek, made worse because Long Creek serves a population of in which 80 percent of youth have one or more mental health illnesses.

104.   Long Creek provides inadequate de-escalation training for the juvenile population—who are developmentally different than adults. Indeed, the CCLP Report found that Long Creek should provide additional de-escalation training.

105.   Maine is one of the few states in the country in which the juvenile detention facilities operate within an adult corrections department. *See* Juvenile Justice Geography, Policy, Practice & Statistics, http://www.jjgps.org/juvenile-justice-services.

106.   Most training for new correctional officers at Long Creek is provided by DOC alongside correctional officers who will work in adult prisons. Specifically, five out of eight weeks of training is provided alongside correctional officers in adult facilities and geared towards working with adult inmates.

107.   The de-escalation training in that context is completely inadequate for a juvenile population with mental health disabilities. Long Creek officials knew (or were deliberately ignorant) that this de-escalation training was inadequate, given their knowledge, through reviewing incident reports, of instances of inappropriate force against youth.

108.   Indeed, Defendant Commissioner Fitzpatrick has stated that DOC leadership at Long Creek was already aware of many of the problems discussed in the CCLP Report. As reported in one article, "Fitzpatrick said the issue about mental health treatment has indeed been a growing problem and one he said he identified in advance of the [CCLP] audit."[1]

---

[1]   Eric Russell, *Audit critical of Long Creek confirmed what officials knew, corrections chief says, but fixes are being made*, PORTLAND PRESS HERALD, (Dec. 21, 2017), available at

109.    Despite the known increase in youth with mental health illness and instances of excessive force against youth, Long Creek officials failed to order additional, youth-specific de-escalation training.

110.    That lack of training contributed to the officer's failure to use de-escalation techniques with A.I.

111.    In sum, Long Creek was deliberately indifferent to A.I.'s need for reasonable accommodation and intentionally withheld such accommodation. In the month leading up to the July 26 incident, Long Creek officials withheld medical and other mental health treatment from A.I. and instead punished A.I. for his symptoms by subjecting him to room confinement and other punishments. That made A.I.'s symptoms even worse. And on July 26, 2017, instead of providing reasonable accommodation by using a mental health clinician or de-escalation methods, Long Creek officials bashed A.I.'s head into a metal bed frame. Knocking out A.I.'s front teeth was not reasonable accommodation.

112.    Upon information and belief, the Long Creek policies that caused the discrimination—including withholding mental health clinicians and providing inadequate de-escalation training—are ongoing to this day.

## VII.    A.I.'s Serious Injury And Risk Of Imminent Return To Long Creek

113.    The July 26th incident has caused A.I. serious pain and suffering. Since the incident, A.I. has suffered from headaches, which did not occur before the attack. He has also become more irritable and suffered from additional emotional disturbances.  His front teeth are still missing, and A.I. must attend school with empty sockets where his front teeth used to be, which causes him emotional distress and embarrassment.

---

https://www.pressherald.com/2017/12/21/maine-corrections-commissioner-responds-to-critical-audit-of-long-creek/.

114.    A dentist has informed A.I. that the dentist cannot perform faciomaxillary surgery and provide dental implants until A.I. is 18.  In the meantime, A.I. will have no front teeth, and will continue to suffer.

115.    In addition to medical concerns, A.I. suffers from the stigma of having missing teeth as an adolescent sixth grade student.  The following photograph was taken after the skin on A.I.'s face healed from the assault, and fairly and accurately depicts A.I.'s dental injury:



116.    A.I. also suffers the physical, mental, and emotional effects of trauma.

117.    In addition to the injury from the July 26, 2017 incident, and related constitutional and statutory violations, A.I. suffers from the imminent risk of being sent back to Long Creek. In early 2018, after being held incompetent to stand trial on all prior charges, A.I. was charged with two new offenses, which are currently pending in juvenile court.

### FIRST CAUSE OF ACTION
**Violation of 42 U.S.C. § 1983 – Use of Excessive Force in Violation of the Fourteenth Amendments of the United States Constitution**
**(Officer Mullin, Officer Ferrante)**

118.    Plaintiff Sadiya Ali, on behalf of A.I., reasserts and realleges the allegations in paragraphs 1-117.

119.    Officer Mullin and Officer Ferrante, while acting under color of state law, deliberately, purposefully, and knowingly used excessive force against A.I. that was objectively unreasonable in violation of the Fourteenth Amendment of the United States Constitution.

120.    Officer Mullin and Officer Ferrante maliciously and sadistically applied excessive force for the purpose of causing harm to A.I.

121.    The use of force deprived A.I. of his clearly established right to due process, as guaranteed by the Fourteenth Amendment to the United States Constitution.  *See, e.g.*, *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015); *Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007).

## SECOND CAUSE OF ACTION
### Violation of 42 U.S.C. § 1983 – Deliberate Indifference to A.I.'s Medical Needs in Violation of the Fourteenth Amendment
### (Officer Mullin, Officer Ferrante, CCS, NP Foster, Dr. Drohan)

122.    Plaintiff Sadiya Ali, on behalf of A.I., reasserts and realleges the allegations in paragraphs 1-117.

123.    Defendants Officer Mullin, Officer Ferrante, CCS, Nurse Practitioner Foster, and Dr. Drohan acted in deliberate indifference to A.I.'s serious medical needs, causing an ongoing, unnecessary, and wanton infliction of pain.

124.    The Defendants' deliberate indifference violated, and continues to violate, A.I.'s clearly established right to due process in violation of the Fourteenth Amendment of the United States Constitution.

## THIRD CAUSE OF ACTION
### Violation of 42 U.S.C. § 12132 – Discrimination Against Qualified Individual with Disabilities in Violation of the Americans with Disabilities Act and the Rehabilitation Act
### (DOC, Long Creek, Commissioner Fitzpatrick, Superintendent Raymond)

125.    Plaintiff Sadiya Ali, on behalf of A.I., reasserts and realleges the allegations in paragraphs 1-117.

126.    A.I. is a qualified individual with mental health disabilities.

127.    Defendants DOC, Long Creek, Fitzpatrick, and Raymond, in their official capacities, intentionally refused to provide reasonable accommodation and thereby discriminated

against A.I. because of his disability, in violation of A.I.'s rights under 42 U.S.C. § 12132, and 29 U.S.C. § 794(d).

## FOURTH CAUSE OF ACTION
### Violation of 5 M.R.S. § 4682(1-A) – Excessive Force in Violation of Article I, Sections 1, 6, and 6-A of the Maine Constitution
### (Officer Mullin, Officer Ferrante)

128.    Plaintiff Sadiya Ali, on behalf of A.I., reasserts and realleges the allegations in paragraphs 1-117.

129.    Officer Mullin and Officer Ferrante subjected A.I. to excessive force in violation of the "safety" provision of Article I, Section 1 of the Maine Constitution, which protects his "inherent and unalienable right[]" to "safety."

130.    Officer Mullin and Officer Ferrante subjected A.I. to excessive force in violation of Article I, Section 6 of the Maine Constitution, which protects the "[r]ights of persons accused" not to "be deprived of life, liberty, property or privileges," and in violation of Section 6-A, which protects the right to "due process."

## FIFTH CAUSE OF ACTION
### Negligence – Negligent Use of Force in Violation of 14 M.R.S. §§ 8101-8118
### (Officer Mullin, Officer Ferrante)

131.    Plaintiff Sadiya Ali, on behalf of A.I., reasserts and realleges the allegations in paragraphs 1-117.

132.    Officer Mullin and Officer Ferrante harmed A.I. through their negligent use of force in violation of 14 M.R.S. §§ 8101-8118.

133.    Officers Mullin and Ferrante have a duty to protect and supervise youth in their care.

25

134.    Officer Mullin and Officer Ferrante breached those duties when they bashed A.I.'s head into the bare metal bed frame.

135.    Officer Mullin and Officer Ferrante's breach caused harm to A.I., including knocking out his front teeth and other physical and emotional harm.

## PRAYER FOR RELIEF

Wherefore, Sadiya Ali, on behalf of A.I., respectfully prays that this Honorable Court:

136.    Enter judgment in her favor awarding compensatory and punitive damages, plus pre-judgment and post-judgment interest;

137.    Award her reimbursement of her costs of suit, including reasonable attorney fees and other litigation costs incurred in bringing this action pursuant to 42 U.S.C § 1988 or 5 M.R.S.A. § 4683;

138.    Issue an injunction ordering Defendants to cease violating the Americans with Disabilities Act and the Rehabilitation Act, and enjoining future unconstitutional excessive force and deliberately indifferent medical care against pre-trial detainees;

139.    Grant such further relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS IN HER COMPLAINT SO TRIABLE AS OF RIGHT.**

Dated:  March 14, 2018

/s/ Emma E. Bond
Emma E. Bond
ACLU of Maine Foundation
121 Middle St., Ste. 200
Portland, Maine 04101
(207) 619-8687
*E-mail: ebond@aclumaine.org*

/s/ Zachary L. Heiden
Zachary L. Heiden
ACLU of Maine Foundation
121 Middle Street, Suite 200
Portland, Maine 04101
(207) 619-6224
*E-mail: zheiden@aclumaine.org*

/s/ Jodi L. Nofsinger
Jodi L. Nofsinger
Berman and Simmons
129 Lisbon Street
Lewiston, Maine 04240
(207) 784-7699
*Email: jnofsinger@bermansimmons.com*

27

The undersigned certifies that he has electronically filed this date the foregoing Complaint with the Clerk of the Court using the CM/ECF system and by mailing a copy of the Complaint via U.S. Mail, postage prepaid to counsel for Defendant at:


Dated: March 14, 2018                    /s/ Emma E. Bond
                                         Emma E. Bond
                                         ACLU of Maine Foundation
                                         121 Middle St., Ste. 200
                                         Portland, Maine 04101
                                         (207) 619-3662
                                         *E-mail: ebond@aclumaine.org*

28